******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* DANTE ALEXANDER HUGHES
## (SC 20268)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crimes of manslaughter in the first degree with a firearm and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court, claiming that the state had failed to satisfy its burden of disproving his claim of self-defense beyond a reasonable doubt and that the trial court improperly had denied his motion for a new trial on the ground of juror misconduct. While the defendant and his girlfriend, K, were drinking and socializing at a bar, they began to argue, and K struck the defendant in the face with a beer bottle. K then left the bar with the keys to their vehicle, and the defendant followed her. At the request of a bartender, several patrons, including the victim, went outside to check on K. As K was seated in the driver's seat of the couple's vehicle, the defendant punched her in the face. The victim and another patron pulled the defendant away from K, and the defendant and the victim started to argue. Another patron intervened, and the situation appeared to have calmed down, but, moments later, the defendant shot the victim three times with a gun that he had removed from the vehicle and then fled the scene. Shortly thereafter, the defendant fled to Canada. At trial, the defendant asserted that he had acted in self-defense and offered his account of the events. He testified, inter alia, that, at the time of the shooting, he thought that the victim was reaching for a gun because the victim had threatened him and had reached into the waistband of his pants. Following his conviction, the defendant filed a motion for a new trial on the ground of juror misconduct after learning that, during deliberations, a juror, J, had consulted a dictionary for the definition of "manslaughter." Following a hearing, at which the jurors, including J, were individually questioned, the trial court, relying on the standard set forth in *State* v. *Johnson* (288 Conn. 236), denied the defendant's motion, concluding that no actual prejudice had resulted from J's misconduct. *Held*:

1. The state presented sufficient evidence to satisfy its burden of disproving the defendant's claim of self-defense beyond a reasonable doubt, there having been ample evidence to support a finding that, at the time of the shooting, the defendant did not subjectively or reasonably believe that the victim was about to draw a gun and to use deadly physical force against him: the evidence provided a reasonable basis for the jury to find that the victim was not armed and never acted in a violent or menacing manner toward the defendant and that, from the victim's perspective, the confrontation had deescalated and appeared to be resolved just before the shooting; moreover, the jury was free to discredit the defendant's version of events and to credit the testimony of the other witness and reasonably could have rejected the defendant's dubious explanation that he had retrieved his loaded gun, moments before shooting the victim, to safeguard it rather than to use it to shoot the victim; furthermore, the jury could have given weight to the fact that, prior to the defendant's interview with the police, he never claimed to have acted in self-defense and the fact that, when he finally did so, he gave inconsistent accounts, and there was significant consciousness of guilt evidence from which the jury was free to infer that the defendant knew that his conduct was wrongful.

2. This court concluded that the presumption of prejudice articulated in *Remmer* v. *United States* (347 U.S. 227) applies when a defendant demonstrates that a juror consulted a dictionary definition of a material term that substantively differed from the legal definition of that term provided by the trial court, thereby shifting the burden to the state to prove that the exposure to the definition was harmless beyond a reasonable doubt; in the present case, the defendant established his entitlement to the presumption of prejudice, as the dictionary definition that the juror

consulted was of an essential legal term and it differed materially from the trial court's definition of the elements of manslaughter.

3. The trial court properly denied the defendant's motion for a new trial, that court having correctly concluded that the juror misconduct caused no actual prejudice to the defendant, and, accordingly, the state's burden of proving that the misconduct was harmless necessarily was met: this court was not persuaded by the defendant's contention that the trial court applied an incorrect legal standard simply because it framed its inquiry into the juror misconduct in terms of the misconduct's effect on the jurors' impartiality, as it was apparent that that court ascribed the proper, broader meaning to the term impartiality and that it used the term to encompass the critical questions relevant to a proper inquiry into the matter; moreover, the record clearly established that there was no reasonable possibility that any member of the jury relied on the dictionary definition to the defendant's detriment in reaching the verdict, as the trial court credited J's testimony that he had relied on only the court's instruction defining manslaughter and that the dictionary definition of manslaughter did not influence his decision in the case, and the other jurors credibly testified that their impartiality remained unaffected by any potential exposure to the extrinsic dictionary definition, which dispelled any concern about their ability to be fair and impartial; furthermore, the trial court's conclusion was bolstered by the fact that the misconduct occurred before the court specifically directed the jury not to consult the dictionary and to rely exclusively on the elements noted in the court's instruction on the crime of manslaughter, and it was reasonable to presume that the jurors followed the court's instructions.

Argued March 31—officially released November 23, 2021*

*Procedural History*

Substitute informations charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of New London, where the murder charge was tried to the jury before *Jongbloed, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm; thereafter, the charge of criminal possession of a firearm was tried to the court, *Jongbloed, J.*; finding of guilty; judgment of guilty in accordance with the jury's verdict and the court's finding; subsequently, the court denied the defendant's motion for a new trial, and the defendant appealed this court. *Affirmed.*

*Vishal K. Garg*, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, former state's attorney, and *Paul J. Narducci*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. Following a jury trial, the defendant, Dante Alexander Hughes, was convicted of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a, after the jury found him not guilty of murder but rejected his claim of self-defense. In a subsequent trial to the court, the defendant was found guilty of criminal possession of a firearm in violation of General Statutes § 53a-217 in connection with the same incident. On appeal,[1] the defendant claims that the evidence presented at trial was insufficient to disprove, beyond a reasonable doubt, any of the elements of self-defense because the state failed to present affirmative evidence that discredited the defendant's testimonial account of the incident. The defendant also claims that the trial court improperly denied his motion for a new trial on the ground of juror misconduct, specifically, a juror's consultation of a dictionary definition of "manslaughter," because the court applied an incorrect legal standard and misallocated the burden of proof. We affirm the judgment of conviction.

The record reveals the following facts, which the jury reasonably could have found, and procedural history.[2] In the early morning hours of December 11, 2016, the defendant and his girlfriend, Latoya Knight, stopped for a drink at Ryan's Pub, a neighborhood bar in Groton, after Knight picked the defendant up from work in the couple's Nissan Armada. Knight was already intoxicated when the couple arrived at the pub. While the defendant and Knight were inside the pub, the defendant engaged in a friendly conversation with two other patrons, John Hoyt and then the victim, Joseph Gingerella.

At some point, the defendant and Knight started arguing. Knight slapped a beer bottle out of the defendant's hand, picked it up, and hit him in the face with it. She then demanded the keys to the Armada and stormed outside through the pub's side door with the keys in hand. When the defendant went to follow her, the pub's bartender, Rachel Smith, tried to stop him because she could see that he was angry and told him not to hurt Knight. The defendant pushed Smith away and continued to follow Knight. Smith then asked Andrew Flynn, another patron, Hoyt, and the victim to check on Knight.

When the defendant reached the Armada, Knight was sitting in the driver's seat. The defendant opened the door and punched Knight multiple times in the face, causing her nose to bleed. Hoyt and the victim then approached the Armada, positioned themselves on either side of the defendant, and attempted to stop the assault. Hoyt put his hands underneath the defendant's arms and tried to pull him away. The victim also tried to pull the defendant away from Knight and yelled, "[y]ou're not gonna hit her like that! . . . [Y]ou're not

gonna put your hand[s] on her!" The defendant and the victim continued arguing, and Flynn intervened by extending his arms between the two of them and telling them to "chill."

Another pub patron observing the incident, Elvira Gonzalez, saw both Flynn and the victim gesture with their hands for the defendant to calm down. Smith, who had gone outside to tell everyone to calm down, saw Flynn gesture to her that everything was okay. Seconds later, several witnesses present at the scene heard multiple gunshots fired, but no one saw the defendant pull the trigger or observed the victim immediately before he was fatally shot.[3] After Hoyt heard the shots, he turned around to see what had happened and saw the defendant holding a gun and the victim lying on the ground, shielding himself with his hand up. The defendant then fled the scene.

The defendant went to his home, changed his clothes, and made phone calls to his two brothers, his sister, and his mother. Thereafter, one of the defendant's brothers picked him up and drove him to the Norwich home of their uncle, Shelton Rawls. The defendant told Rawls that he had shot someone after telling that person to mind his own business and to leave him and Knight alone, and that he thought he had killed this person. He asked Rawls to cut his hair, and Rawls then cut off the defendant's green dreadlocks. The defendant's other brother met the defendant at Rawls' house later that morning to give the defendant a new prepaid cell phone. Before turning off the subscriber phone that he had been using, the defendant sent a text message to his work supervisor that stated, "[n]ot coming in for a long time . . . ."

The defendant made arrangements to be driven to Boston, Massachusetts, by one of his brother's friends and decided to make his way across the Canadian border from there. While heading to Canada, the defendant called several family members using the prepaid phone but used a function on the phone that prevents the person receiving the call from seeing the phone number of the person who is calling. The defendant made a stop at Niagara Falls, New York, and threw the gun that he had used to shoot the victim into the Niagara River. Afterward, he walked across a bridge into Canada, where he was detained by Canadian border agents.

Nine days after the shooting, Groton police detectives drove to Canada, took custody of the defendant, and brought him back to Connecticut, where he was placed under arrest. Groton detectives subsequently interrogated the defendant. For most of the approximately two hour interrogation, the defendant denied any involvement in the shooting. He falsely claimed that he had left the area before the shooting occurred and had no idea how it happened. He also falsely claimed that he did not own a gun, had fought with Knight outside

the pub but no one intervened, had left the pub after calling a cab to take him to the bus station, had cut his hair in Buffalo, New York, because he had an upcoming job interview, and had traveled to Canada for enjoyment. At one point, when the interrogating officers urged the defendant to tell them the real story because they already knew that he had shot the victim, he responded, "[y]ou got no cameras." Approximately one hour and forty minutes into the interrogation, the defendant admitted that he had shot the victim but claimed to have done so in self-defense. He claimed that the victim had started to pull up his shirt, and the defendant "thought [that the victim] was reaching for something . . . that he was going for a gun." He stated that he was trying to protect himself and was "not trying to kill [the victim]." He also indicated that he "didn't know [that the victim] didn't have nothin'."

In two substitute informations, the defendant was charged with murder in violation of General Statutes § 53a-54a (a) and criminal possession of a firearm. At trial, the defendant asserted a defense of self-defense. The state disputed that the defendant had acted in self-defense but also argued that he was not entitled to the defense because he had a duty to retreat.[4] At the close of evidence, pursuant to the state's request, the trial court instructed the jury on both murder and the lesser included offense of manslaughter in the first degree with a firearm. The court also instructed the jury on its obligation to consider whether the defendant acted in self-defense, if it found the defendant guilty of either crime.

The jury found the defendant guilty of manslaughter in the first degree with a firearm, and the court thereafter found the defendant guilty of criminal possession of a firearm. The court rendered judgment in accordance with the verdict and its finding, and imposed a total effective sentence of fifty years of imprisonment, execution suspended after forty-five years, followed by five years of probation.

Following his conviction, the defendant filed a motion for a new trial on the ground of juror misconduct, after learning that, during deliberations, a juror had consulted a dictionary for the definition of "manslaughter." The trial court recognized that misconduct had occurred but, following a hearing, denied the motion, concluding that no actual prejudice resulted from the misconduct. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that he is entitled to an acquittal on the charge of manslaughter in the first degree with a firearm because the state failed to meet its burden, pursuant to General Statutes § 53a-12 (a),

of disproving, beyond a reasonable doubt, any of the elements of his self-defense claim. He contends that the state was obligated to present affirmative evidence to discredit his testimonial account of what occurred at the precise moment of the shooting. Specifically, he claims that the state failed (1) to present affirmative evidence that the victim did not make a gesture that the defendant could reasonably have believed was as an attempt to reach for a deadly weapon, or (2) to establish the statutory disqualification for self-defense of failure to retreat. The state asserts that it can, and did, satisfy its burden of persuasion through direct and circumstantial evidence proving that the defendant did not reasonably believe that the victim was about to use deadly physical force against him. We agree with the state. Therefore, we need not consider the state's alternative claim that, even if the defendant had held such a belief, the jury reasonably could have concluded that he had a duty to retreat.

The defendant did not raise this insufficiency claim in the trial court, but his unpreserved claim is nonetheless reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We have previously recognized that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*."[5] (Internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). Because there is no independent significance of a *Golding* analysis in this context, we review an unpreserved sufficiency of the evidence claim as though it had been preserved. See *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993).

We begin with the theory of self-defense advanced by the defendant and then turn to the relevant legal principles. The defendant offered the following account in his testimony. The defendant was assaulting Knight inside the Armada while Hoyt and the victim were trying to pull him off of her. During the struggle between the defendant and the victim, the victim called him a "bitch ass" and an offensive racial epithet, and also stated that he would "F [him] up . . . ." The defendant did not have a gun on him at that time but retrieved his Glock nine millimeter pistol from the overhead console of the Armada and placed it in his pocket when he saw that Knight was starting the Armada in an attempt to leave. He did so because he was concerned that, given Knight's intoxicated state, the police might stop the Armada and, in turn, discover the gun. The gun was already loaded and cocked when the defendant removed it from the Armada. The defendant then started to walk away from the Armada, while Hoyt and the victim remained with Knight. When he got one or two parking spaces past

the Armada, where it was kind of dark, he had an "urge" to turn around and, upon doing so, saw the victim approximately fifteen feet away. The victim said nothing, but he reached into his waistband. The defendant thought that the victim was going to shoot him, so the defendant "came up and just shot." The defendant was unsure whether any bullets actually struck the victim.

On cross-examination, the defendant admitted that, after the shooting, he had contacted relatives, changed his appearance (clothes and hair), switched cell phones, tried to conceal the source of his outgoing calls, and gone to Canada. He also admitted that he gets "fired up" when people lay hands on him. In explaining why Knight deserved the beating that he had inflicted on her, he stated, "you know, you just take nothing from nobody. Once somebody puts their hands on you, you know, you have [a] right to defend yourself."

We assess this evidence, as well as the other evidence adduced by the state, pursuant to the following principles. "Under our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. See General Statutes § 53a-16." (Citation omitted.) *State* v. *Clark*, 264 Conn. 723, 730, 826 A.2d 128 (2003). Whereas an affirmative defense requires the defendant to establish his claim by a preponderance of the evidence; see General Statutes § 53a-12 (b); a properly raised defense places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12 (a). "Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 730–31. "As these principles indicate, therefore, only the state has a burden of persuasion regarding a self-defense claim . . . ." (Internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 631, 123 A.3d 398 (2015).

Because the state bears the burden of disproving self-defense, the standard for reviewing claims of insufficient evidence in conjunction with a defense of justification such as self-defense is essentially the same standard used when examining claims relating to insufficient proof of the elements of a charged offense. See *State* v. *Revels*, supra, 313 Conn. 778. "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020). In reviewing the sufficiency of evidence, we apply a two part test. "First, we construe the evidence in the light

most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). In doing so, we are mindful that "the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Drupals*, 306 Conn. 149, 158, 49 A.3d 962 (2012). "[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Rhodes*, supra, 229. "[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517, 782 A.2d 658 (2001). Thus, in the present case, we construe the evidence and all the reasonable inferences drawn therefrom in the light most favorable to supporting the jury's rejection of the defendant's defense.

Section 53a-19 sets forth the narrow circumstances in which a person is justified in using deadly physical force on another person in self-defense. Under § 53a-19 (a), "a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . [T]he test a jury must apply . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant . . . [but] . . . the defendant's belief ultimately must be found to be reasonable."[6] (Internal quotation marks omitted.) *State* v. *Reddick*, 174 Conn. App. 536, 552, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied,      U.S.     , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018).

Thus, with regard to the first requirement of self-defense, the jury must make two separate affirmative determinations for the defendant's claim of self-defense to succeed. The jury must determine whether, on the basis of all of the evidence presented, the defendant in fact believed that the victim was about to use deadly physical force.[7] See, e.g., *State* v. *Prioleau*, 235 Conn. 274, 286, 664 A.2d 743 (1995). This initial determination typically requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief is in fact

credible. Id. If the jury determines that the defendant did not believe that the victim was about to use deadly physical force when the defendant employed deadly force, the defendant's self-defense claim must fail. Id., 287. Even if the jury finds that the defendant may have held such a belief, if that belief was not objectively reasonably, the self-defense claim must fail. See id.

It bears emphasizing that, in making these determinations, the trier of fact is entitled to believe or disbelieve all, part, or none of any witness' testimony, and the fact that certain evidence is not controverted does not mean that it must be credited. See *State* v. *DeMarco*, 311 Conn. 510, 520 n.4, 88 A.3d 491 (2014); *State* v. *Brown*, 299 Conn. 640, 648, 11 A.3d 663 (2011); E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.23.8, p. 378. The credibility of a witness may be impeached by showing, inter alia, that the witness is biased due to having an interest in the matter; see Conn. Code Evid. § 6-5; or that the witness made a prior inconsistent statement. See Conn. Code Evid. § 6-10.

These well established principles disprove the defendant's contention that, in the absence of affirmative evidence from at least one other witness of what happened between the defendant and the victim in the moments immediately before the defendant fired his gun, the jury must accept the defendant's testimony in determining whether he reasonably believed that the victim was reaching for a gun, thereby justifying his use of deadly physical force on the victim. This argument ignores the fact that the jury was free to reject the defendant's testimony as to his belief after considering any other evidence, including other portions of the defendant's testimony and his prior statements, that was inconsistent with his self-defense claim. The jury similarly was free to discredit the defendant's version of the events immediately preceding and following the shooting and, instead, could have credited the testimony of the other witnesses. When presented with conflicting accounts, the jury is not required to accept the testimony and inferences offered on behalf of the defendant. See, e.g., *State* v. *James E.*, 154 Conn. App. 795, 815, 112 A.3d 791 (2015) (evidence was sufficient to disprove self-defense beyond reasonable doubt), aff'd, 327 Conn. 212, 173 A.3d 380 (2017).

The defendant's argument mistakenly assumes that his testimony was the only evidence presented to the jury that was relevant to his claim of self-defense. As we explain more fully hereinafter, it was not. Although the jury is not free to merely disbelieve the defendant and to conclude that the opposite of what he said was true; see *Ventura* v. *East Haven*, 330 Conn. 613, 641–42, 199 A.3d 1 (2019); *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985); the jury may reject his self-defense claim if other evidence and reasonable inferences drawn therefrom undermine the credibility of his

account. See *State* v. *Grasso*, 189 Conn. App. 186, 212–13, 207 A.3d 33, cert. denied, 331 Conn. 928, 207 A.3d 519 (2019) (evidence of blackmail by victim and its effect on defendant supports jury's rejection of self-defense claim, even though only victim and defendant were present when shooting occurred); *State* v. *Cruz*, 75 Conn. App. 500, 519, 816 A.2d 683 (2003) (defendant's argument, based mostly on his own testimony, that only reasonable conclusion jury could have reached was that he acted in self-defense "relates to witness credibility, not sufficiency of the evidence"), aff'd, 269 Conn. 97, 848 A.2d 445 (2004).

Having reviewed the evidence in its entirety, and construing it in the light most favorable to sustaining the verdict, we conclude that there was a rational view of the evidence that proved beyond a reasonable doubt that, at the time of the shooting, the defendant did not reasonably believe that the victim was about to use deadly physical force against him.

The evidence provided an ample basis for the jury to find that the victim was not in fact armed and never acted in a violent or menacing manner toward the defendant. No weapon was found on or near the victim after the shooting.[8] The defendant did not claim that the victim ever mentioned having a gun or any other weapon. None of the witnesses to the events occurring outside the pub, including the victim's nearby companions, heard the victim threaten the defendant or use the language the defendant described.[9] The victim attempted to pull the defendant away from Knight but never attempted to inflict any physical injury on the defendant. Flynn testified that the argument between the defendant and the victim "didn't seem too serious."

The evidence also provided a reasonable basis for the jury to find that, from the victim's perspective, the confrontation had deescalated and then appeared to have been resolved just before the shooting. Gonzalez saw both Flynn and the victim gesture with their hands for the defendant to calm down and observed what she characterized as a peaceful conversation. After Smith went outside to tell everyone to calm down so that she would not have to call the police, Flynn gestured to her that everything was okay, and she returned inside. Flynn, Smith, and Gonzalez turned away from observing the defendant and the victim, and headed back toward the pub because they believed that the situation had been amicably resolved. According to the testimony of Knight, Hoyt, Smith, and Gonzalez, there was no cause for the victim to become further agitated. Knight was safe, and the effort undertaken by the victim and his friends to defend her had concluded. The defendant had begun to walk away. The collective force of this evidence provided a persuasive basis for the jury to conclude that, even if it were to accept the defendant's assertion that the victim moved his hand in the vicinity

of the waistband of his pants, there was no reasonable basis for the defendant to believe that the victim was about to draw a gun.

The jury also reasonably could have rejected the dubious explanation that the defendant gave for retrieving his loaded gun, moments before firing three shots at the victim. If the defendant actually had been concerned about the consequences of Knight's driving while intoxicated and being found in possession of an illegal firearm, the most effective course of action would have been to withhold the keys to the Armada in the first place or to take them back from her, not to retrieve the gun from the console. His choice of action and its timing left the jury free to infer that the defendant had retrieved the gun not to safeguard it but to use it.

The jury also could have given weight to the fact that, prior to his video-recorded interview with the police approximately nine days after the shooting, the defendant never claimed to have acted in self-defense. He admitted that he had never suggested it to the relatives and friends with whom he spoke after the shooting. Instead, he told Rawls, hours after the shooting, that he had shot and possibly killed someone after that person had interceded in an argument between the defendant and Knight and the defendant told him to mind his own business. Rawls inferred from what he had been told that the victim must not have heeded the defendant's direction. When the defendant finally claimed to have acted in self-defense, he gave inconsistent accounts, in his police interview and at trial, of the particulars.

Finally, the jury's verdict was supported by significant consciousness of guilt evidence. In the self-defense context, such evidence "tend[s] to show that the defendant believed that what he had done was not merely an act of self-defense, but [was] something that was considered wrong in the eyes of the law." *State* v. *Thomas*, 50 Conn. App. 369, 384, 717 A.2d 828 (1998), appeal dismissed, 253 Conn. 541, 755 A.2d 179 (2000). After shooting the victim, the defendant attempted to disguise himself by changing his appearance, fled the state, and then attempted to flee the country. He also attempted to conceal his whereabouts and to destroy evidence. The jury was free to reject his explanations for these actions and to infer that he was deliberately eluding the police to avoid prosecution for conduct he knew was wrong. See *State* v. *Ferrara*, 176 Conn. 508, 516–18, 408 A.2d 265 (1979).

In its totality, the evidence provides ample support for the jury to conclude that the defendant did not believe, subjectively or reasonably, that the victim was about to draw a gun on him. Rather, the evidence supports the jury's reasonable conclusion that, when the defendant fired his gun at the victim, he was still propelled by the rage he had just unleashed on Knight and

angry about the victim's interference in his business. We therefore conclude that there was sufficient evidence to disprove the defendant's claim of self-defense beyond a reasonable doubt.

II

The defendant also claims that the trial court improperly denied his motion for a new trial on the ground of juror misconduct. He contends that the court's conclusion that he suffered no actual prejudice from a juror's consultation of a dictionary definition of "manslaughter" rested on an incorrect legal standard and a misallocation of the burden of proof. We conclude that the trial court properly denied the defendant's motion for a new trial.

The record reveals the following additional relevant facts. In its final instructions to the jury, the trial court set forth the elements that the state was required to prove to establish murder or, alternatively, manslaughter in the first degree with a firearm if it found the defendant not guilty of murder, as well as the elements of self-defense to consider should it find the defendant guilty of either offense. With respect to manslaughter, the court provided the statutory elements—that the defendant must have (1) engaged in conduct that created a grave risk of death, (2) acted recklessly, (3) acted under circumstances evincing an extreme indifference to human life, and (4) caused the death of the victim.[10] See General Statutes § 53a-55 (a) (3). The court also instructed the jury not to "look up anything on the Internet or make any private investigations of any kind," an instruction it had given numerous times during trial. It did not, however, reiterate an instruction given at the commencement of jury selection, almost one month earlier, that the jury should not look up any terms in a dictionary.[11]

On the second day of deliberations, the jury sent a note asking the court to clarify certain aspects of the murder instruction and "whether it is permissible to look up the word manslaughter in the dictionary." The court consulted with counsel and, with their agreement, instructed the jury that it "should use the definition of the specific charge of manslaughter as explained by its elements in [the court's] instructions and not look up anything in any outside sources, including the dictionary."[12]

The following day, on July 26, 2018, the jury of twelve unanimously found the defendant guilty of manslaughter in the first degree with a firearm. The jurors were individually polled, and each juror unequivocally affirmed his or her agreement with the verdict.

On July 31, 2018, one of the jurors, D.M.,[13] engaged in a postverdict conversation with courthouse staff. In that conversation, D.M. mentioned that one of the other jurors had looked up the definition of manslaughter in

a dictionary. This information was reported to the trial court, which then scheduled a hearing to determine whether the jury, or any member thereof, had in fact looked up the definition of manslaughter in a dictionary, and what impact, if any, that action may have had on the jury's deliberations.[14]

Prior to the hearing, counsel agreed to the questions that would be posed by the court to each juror. In accordance with that agreement, each juror was questioned as to whether the dictionary definition of manslaughter had been raised during deliberations, and, if so, when this occurred; whether any outside information had affected the juror's ability to sit fairly and impartially; whether any outside information had affected the juror's ability to follow the court's instructions; and whether the juror had considered only the evidence presented in the courtroom and only the court's instructions. After each juror was questioned, counsel was given the opportunity to propose follow-up questions.

Although a few jurors recalled hearing a discussion about such a definition, they indicated that the discussion had been promptly shut down and that this incident had prompted the jury's note to the court. Those jurors also testified that no dictionary had been brought into the jury room and that either no definition had been read aloud or they could not recall any dictionary definition. Each of the twelve jurors affirmed that no outside information had affected the juror's ability to sit fairly and impartially, that no outside information had affected the juror's ability to follow the court's instructions, and that the juror had considered only the evidence presented in the courtroom and only the court's instructions.

One juror, J.B., admitted in the following exchange, however, that he had consulted a dictionary to obtain a definition of manslaughter:

"The Court: . . . [I]t has come to the court's attention that there may have been a reference to or a discussion regarding a dictionary definition of manslaughter. . . . [W]hat can you tell us about that in terms of your knowledge of that?

"[J.B.]: My knowledge of it, I had a general idea what manslaughter was, and I looked it up in the dictionary and [came] up with a definition.

"The Court: All right. And then was that something you mentioned?

"[J.B.]: Absolutely.

"The Court: Yes. All right. . . . [D]o you recall whether that was before in time or after the note came out?

"[J.B.]: That was before.

"The Court: All right. So . . . after the note came

out and the answer was received to the note that you were to consider the definition that the court provided . . . without going into any of the specific mental processes of the jury's deliberation . . . did that outside information or any outside information affect your ability to sit fairly and impartially as a juror in this case?

"[J.B.]: Yeah, it did. I mean, the—it wasn't the outcome I wanted, I could tell you that, but I mean, it is what it is, I think.

"The Court: I guess my question is, you've indicated that you looked up the definition.

"[J.B.]: Yep.

"The Court: And you mentioned it. Then the jury sent out the note.

"[J.B.]: Yep.

"The Court: And the jury was given instructions from the court at that time. And those instructions were to consider only the definition that the court provided.

"[J.B.]: Correct.

"The Court: And my question is, did you follow the court's instructions?

"[J.B.]: I did."

In response to the court's next questions—whether that outside information, the dictionary definition, affected J.B.'s ability to sit fairly and impartially as a juror in the case and whether he considered information outside of the evidence in the courtroom and the court's instructions in this case—J.B. started to address his own thought process and the vote count on the charges at a certain point in the deliberations. The trial court interrupted J.B. and emphasized that he should not reveal anything about any juror's mental process in reaching a verdict.[15] The inquiry then continued:

"The Court: . . . [S]o, without going into that, my question is really whether any outside information, and you've indicated that you did have some outside information, and then you were told to . . . consider only the definition that the court provided, so my question is, did you in fact—did any outside information affect your ability to fairly and impartially decide this case?

"[J.B.]: No.

"The Court: And then, did you in fact consider—or did any outside information affect your ability to follow the court's instructions in this case?

"[J.B.]: No. I mean, I don't know. I believe I settled. That's what I believed. You know what I mean?

"The Court: All right. I think I understand what you're saying.

"[J.B.]: Yes.

"The Court: And, I guess lastly, were you able to consider and limit your consideration only to the evidence in the case, as well as the court's instructions?

"[J.B.]: Yes."

After defense counsel requested follow-up questions to ascertain what J.B. had reviewed and why, the court elicited the following additional information. J.B. had looked up the definition of manslaughter in a Webster's Dictionary, which he recalled defined the term as "taking a man's life without forethought or malice . . . ." J.B. indicated that the "without forethought" aspect of the definition was important for the other jurors to know because it confirmed J.B.'s prior understanding of manslaughter to mean "an accidental thing." This exchange then ensued:

"The Court: All right. And are you telling us that the reason you looked it up was because it seemed inconsistent with what you had thought or—

"[J.B.]: Sort of.

"The Court: All right. I don't want to put any words into your mouth.

"[J.B.]: I mean, yeah. I mean, I just wanted to have an actual definition of what it was and—

"The Court: All right. And then the court explained that you needed to use the definition that the court had provided.

"[J.B.]: After that, I had done that, correct.

"The Court: And that was afterward?

"[J.B.]: Yes.

"The Court: And did you follow the court's instructions?

"[J.B.]: I mean, basically, I did."

The defendant thereafter filed a motion for a new trial on the ground of prejudicial juror misconduct. The trial court denied the motion, concluding that "no actual prejudice resulted from the conduct" at issue. The court relied on the standard articulated in *State* v. *Johnson*, 288 Conn. 236, 951 A.2d 1257 (2008), in which this court emphasized the limitations on postverdict inquiry of jurors and then observed: "[O]nce a verdict has been reached, the proper inquiry does not involve a determination of what conclusions the jurors *actually* drew but, rather, of whether the jurors were aware of or actually exposed to [extrinsic material], whether it affected their ability to be impartial and whether it was of such a nature that it *probably* rendered the juror[s] unfair or partial." (Emphasis in original; internal quotation marks omitted.) Id., 262–63.

The trial court then applied these three inquiries to the present case. It first found that exposure to the

dictionary definition was limited to one juror and that, with regard to the other jurors' awareness, their responses credibly dispelled any concern that J.B.'s actions had tainted them. Second, the court found that the jurors' credible assurances that their impartiality remained unaffected by any potential exposure to the extrinsic dictionary definition dispelled any concern about the jurors' ability to be impartial. With respect to J.B. specifically, the court found that some of his answers were nonresponsive but interpreted those comments to simply reflect J.B.'s frustration that he had compromised to reach consensus with other jurors. The court found that J.B.'s subsequent answers dispelled any concerns of impartiality. Finally, the court found that the nature of the information was not of the sort to compel a finding of prejudice. The court concluded that our appellate case law did not deem reference to a dictionary inherently prejudicial. It also found no prejudice under the particular facts of this case because "utilization of [the] dictionary definition [of manslaughter] would be inconsistent with the actual verdict reached," given the difference between that definition and the statutory definition that the jury applied.[16] In considering the second and third *Johnson* inquiries, the court also relied on the black letter principle that, "[i]n the absence of a clear indication to the contrary, [the court] must presume that the jury followed [the court's] instruction." *State* v. *Asherman*, 193 Conn. 695, 737–38, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The trial court rejected the defendant's reliance on case law from other jurisdictions, concluding that each case was factually distinguishable.

In his appeal to this court, the defendant's challenge to the legal standard applied by the trial court has several threads. We glean three distinct points. First, the defendant contends that the trial court incorrectly relied on the impartiality standard in *State* v. *Johnson*, supra, 288 Conn. 262–63, because the misconduct in the present case is not of the type that raises concerns of juror partiality. He asserts that the trial court, instead, should have considered whether the extrinsic information interfered with J.B.'s ability to judge the case solely on the basis of the definition provided by the court, and whether the verdict was influenced by J.B.'s arguments in deliberations in reliance on the dictionary definition. Second, the defendant contends that the trial court improperly placed the burden on him to prove prejudice. Although there is a split of authority in other jurisdictions with respect to this issue, he contends that this court's case law suggests that we follow the jurisdictions that would apply a presumption of prejudice, which in turn would require the state to prove that there was no reasonable possibility that J.B.'s consultation of a dictionary influenced the verdict. Third, the defendant contends that the trial court improperly

failed to determine that the state did not meet this burden. He asserts that this conclusion is compelled either by the testimony adduced at the hearing or under various objective tests applied by other jurisdictions to assess prejudice under such circumstances.[17]

The state questions the defendant's preservation of some of these issues but contends that, in any event, the trial court unambiguously allocated the burden of proof to the state, consistent with the state's acknowledgment during the hearing on the motion for a new trial that a presumption of prejudice applied and that it had the burden to prove that there was no prejudice. The state further contends that it met this burden of proof no matter which test is applied.[18]

Insofar as the defendant's claims bear on the proper legal standard, they are subject to plenary review. See, e.g., *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 214, 192 A.3d 406 (2018) (legal standard generally); *In re Jason R.*, 306 Conn. 438, 452, 51 A.3d 334 (2012) (misallocation of burden of proof). Insofar, however, as they challenge the trial court's assessment of the credibility of the jurors' testimony at the hearing inquiring into the alleged misconduct, or the reasonableness of inferences drawn from such testimony, we review such assessments under the abuse of discretion standard. See, e.g., *State* v. *Dixon*, 318 Conn. 495, 506–507, 122 A.3d 542 (2015); *State* v. *Small*, 242 Conn. 93, 113, 700 A.2d 617 (1997). See generally *State* v. *Newsome*, 238 Conn. 588, 628, 682 A.2d 972 (1996) (motion for new trial based on allegations of juror misconduct "is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds" (internal quotation marks omitted)).

We agree with the defendant, and the state's concession, that J.B.'s consultation of a dictionary definition of manslaughter was presumptively prejudicial under the circumstances in the present case and that the state bore the burden of proving that this juror misconduct was harmless. We do not share the state's confidence that the trial court necessarily allocated the burden of proof to the state, as this matter was not expressly decided in the court's decision on the defendant's motion.[19] Nonetheless, if the court correctly determined that the facts demonstrated that the defendant suffered *no* actual prejudice from the juror misconduct, the state's burden of proof would be met.[20] See *State* v. *Berrios*, 320 Conn. 265, 299, 129 A.3d 696 (2016) (concluding that state overcame presumption of prejudice by proof that jurors' impartiality was not affected by third-party contact); see also *United States* v. *Olano*, 507 U.S. 725, 739, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) ("There may be cases [in which] an intrusion should be presumed prejudicial . . . but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect

the jury's deliberations and thereby its verdict?" (Citations omitted.)). We conclude that the trial court's determination is supported by the law and the record in this case.

A

Our analysis is guided by the following principles. "Under the constitution of Connecticut, article first, § 8, and the sixth amendment to the United States constitution, the right to a trial by jury guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Roman*, 320 Conn. 400, 408, 133 A.3d 441 (2016); see also *Morgan* v. *Illinois*, 504 U.S. 719, 727, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). A necessary component of the right to an impartial jury is the right to have the jury decide the case "solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court." *State* v. *Rodriguez*, 210 Conn. 315, 325, 554 A.2d 1080 (1989); see also *Hughes* v. *Borg*, 898 F.2d 695, 700 (9th Cir. 1990) ("[s]tate defendants have a federal constitutional right to an impartial jury and jurors have a correlative duty to consider only the evidence that is presented in open court").

"Consideration of extrinsic evidence is jury misconduct and has been found to be sufficient to violate the constitutional right to a trial by an impartial jury." *State* v. *McCall*, 187 Conn. 73, 80, 444 A.2d 896 (1982). Most courts treat a juror's exposure to any extra-record information, whether relating to the facts or the law in the case, as a form of extrinsic evidence or influence. See, e.g., *United States* v. *Pagán-Romero*, 894 F.3d 441, 446–47 (1st Cir.), cert. denied, U.S. , 139 S. Ct. 391, 202 L. Ed. 2d 299 (2018); *United States* v. *Rosenthal*, 454 F.3d 943, 949 (9th Cir. 2006); *United States* v. *Aguirre*, 108 F.3d 1284, 1288 (10th Cir.), cert. denied, 522 U.S. 931, 118 S. Ct. 335, 139 L. Ed. 2d 260 (1997); *United States* v. *Martinez*, 14 F.3d 543, 550 (11th Cir. 1994); see also *United States* v. *Steele*, 785 F.2d 743, 746 (9th Cir. 1986) ("extraneous information" and "extrinsic material"); *State* v. *Klafta*, 73 Haw. 109, 122, 831 P.2d 512, 519 (1992) (" 'extraneous definitions or statements of law' "); *Allers* v. *Riley*, 273 Mont. 1, 9, 901 P.2d 600 (1995) ("extraneous materials"); *State* v. *Abell*, 383 N.W.2d 810, 812 (N.D. 1986) ("improper extraneous information"); *Ryser* v. *State*, 453 S.W.3d 17, 41 (Tex. App. 2014, pet. ref'd) (" 'outside influence' "). Information obtained through juror consultation of a dictionary is generally considered to be extrinsic information and thus misconduct.[21] See *United States* v. *Pagán-Romero*, supra, 447; *United States* v. *Aguirre*, supra, 1288; *United States* v. *Martinez*, supra, 550.

"It is well established, however, that not every incident of juror misconduct requires a new trial." *State* v. *Newsome*, supra, 238 Conn. 627. "[D]ue process seeks

to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (Internal quotation marks omitted.) *State* v. *Tomasko*, 242 Conn. 505, 513, 700 A.2d 28 (1997); see also *State* v. *Asherman*, supra, 193 Conn. 736 ("Juror misconduct [that] results in substantial prejudice to the defendant is not to be tolerated. But not every irregularity in a juror's conduct compels reversal. The dereliction must be such as to deprive the defendant of the continued, objective and disinterested judgment of the juror, thereby foreclosing the accused's right to a fair trial." (Internal quotation marks omitted.)). "The question is whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Citation omitted; internal quotation marks omitted.) *State* v. *Newsome*, supra, 628.

Although these principles are broadly accepted, courts are divided on whether exposure to certain extrinsic influences should be deemed presumptively prejudicial and, if so, whether such a presumption shifts the burden to the state to prove the harmlessness of the misconduct. See *State* v. *Berrios*, supra, 320 Conn. 284–92. This divide largely turns on whether the court has concluded that the presumption of prejudice articulated in *Remmer* v. *United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (*Remmer* presumption), a jury tampering case, retains its vitality or whether the court has interpreted subsequent United States Supreme Court case law to indicate that the due process holding in *Remmer* only entitles the defendant to a hearing, at which he bears the burden of proving actual prejudice. Although this court seemed to endorse the latter view in one case; see *State* v. *Johnson*, supra, 288 Conn. 254; we expressly left this issue open in several other cases because the party claiming the presumption could not prevail, even if the burden of proof shifted to the state. See *State* v. *Berrios*, supra, 282–83 (noting that uncertainties resulting from post-*Remmer* cases created inconsistencies in our own case law and citing cases).

In *State* v. *Berrios*, supra, 320 Conn. 266–67, we finally weighed in on this issue. In that case, the defendant had moved for a mistrial after a juror reported that the defendant's mother had made comments about the case to the juror during a trial recess. Id., 269; see footnote 24 of this opinion. The trial court denied the defendant's motion following a hearing at which the jurors were questioned about the contact and its effect. Id., 269–73. We held that "the *Remmer* presumption is still good

law with respect to external interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried." (Footnote omitted.) Id., 292. We explained that the defendant bears an initial burden of proving that the *Remmer* presumption applied, through proof that an extrajudicial contact or communication occurred and that the contact or communication pertained to the matter before the jury. Id., 293–94. We further explained that "the *Remmer* presumption is not conclusive. The burden rests heavily on the government to establish that the contact was harmless"; (internal quotation marks omitted) id., 294; meaning that "there was no reasonable possibility that the tampering or misconduct affected the [jurors'] impartiality." (Internal quotation marks omitted.) Id.

Although the holding in *Berrios* was limited to an extrinsic influence initiated by a third party, several factors indicate that the *Remmer* presumption also should apply in cases in which the extrinsic influence is brought to bear by a juror, at least in some such cases. We made a point in *Berrios* of favorably citing the position of the United States Court of Appeals for the Second Circuit that it is "well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial"; (internal quotation marks omitted) id., 287; as well as that of other jurisdictions that apply a presumption of prejudice to "serious, or not innocuous claims of external influence, such as jury tampering, bribery, or use of extra-record evidence." (Internal quotation marks omitted.) Id., 288–89. One of the cases we favorably cited applied a presumption of prejudice to a juror's use of a dictionary; see id., 288, citing *United States* v. *Lawson*, 677 F.3d 629 (4th Cir.), cert. denied sub nom. *Hutto* v. *United States*, 568 U.S. 889, 133 S. Ct. 393, 184 L. Ed. 2d 162 (2012); see also *United States* v. *Lawson*, supra, 645 ("[the *Remmer*] presumption likewise is applicable when a juror uses a dictionary or similar resource to research the definition of a material word or term at issue in a pending case"). The court in *Lawson* observed that there is a split of authority as to whether a juror's consultation of a dictionary is presumptively prejudicial that mirrors the jurisdiction's view of the vitality of the *Remmer* presumption. *United States* v. *Lawson*, supra, 645.

We also observe that, even among those jurisdictions that do not view jurors' consultation of a dictionary to be inherently prejudicial as a general matter, courts have recognized that an exception may exist when jurors are exposed to a dictionary definition of a material term that is manifestly inconsistent with the one provided by the court. See, e.g., *United States* v. *Pagan-Romero*, supra, 894 F.3d 447–48 ("In general, the use of a dictionary will pose a qualitatively less serious risk of harm [than exposure to facts that could be used as evidence]. . . . Of course, exceptions to this general

approach may arise, in cases where, for example, the dictionary definition was contrary to, or confusingly inconsistent with, the instructions, where the jurors confirmed that they had actually relied on the misleading definition, or where the court made an inadequate effort to inquire into the impact of the taint." (Citation omitted.)). See generally *Ryser* v. *State*, supra, 453 S.W.3d 42 (discussing cases); annot., 35 A.L.R.4th 626, 631, 653, §§ 2[b] and 5[b] (1985) (same).

Our lone "dictionary" case is not to the contrary. In *State* v. *Asherman*, supra, 193 Conn. 736, this court set forth the general proposition that "[c]onsideration of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury. . . . But unless the nature of the misconduct on its face implicates his constitutional rights the burden is on the appellant to show that the error of the trial court is harmful." (Citations omitted.) We concluded in *Asherman* that the defendant was not prejudiced as a result of a juror's consultation of a dictionary. Id., 737. In that case, notably, the dictionary had been consulted for the meaning of a generic term, "inference," which the trial court used but did not specifically define in its instructions, and the defendant's concern that the jury could interpret one of the dictionary definitions to allow it to base inferences on speculation was alleviated by the trial court's instructions regarding the use of inferences. Id. We adopted the logic that some other courts have followed; see footnote 21 of this opinion; under which definitions in a standard dictionary are assumed to be common knowledge and, thus, constitute knowledge that jurors are presumed to possess in the absence of an indication to the contrary. See *State* v. *Asherman*, supra, 737. See generally *State* v. *Harris*, 340 S.C. 59, 64, 530 S.E.2d 626 (2000) ("[c]ourts have almost uniformly found no prejudice to the defendant when the dictionary definition did not vary from the ordinary meaning of the words or from the meaning contained in the trial court's instructions"). We had no occasion to consider whether a presumption of prejudice should apply when jurors consider a dictionary definition of a material term that directly conflicts with the legal definition provided by the trial court.

We agree with those jurisdictions that have concluded that a presumption of prejudice applies if the defendant can demonstrate that a juror consulted a dictionary and was thereby exposed to a definition of a material term that substantively differed from the legal definition provided by the court, shifting the burden to the state to prove that this exposure was harmless beyond a reasonable doubt. See *United States* v. *Lawson*, supra, 677 F.3d 645–46 (holding that *Remmer* presumption applies when juror uses dictionary to research definition of "a material word or term at issue in a pending case" and that it was of particular concern

when dictionary was consulted for definition of term that addressed contested element of offense); *United States* v. *Aguirre*, supra, 108 F.3d 1288 ("jury's exposure to extrinsic information [such as a dictionary definition] gives rise to a rebuttable presumption of prejudice"); *United States* v. *Martinez*, supra, 14 F.3d 550 (holding, in case involving several categories of extrinsic evidence, including unauthorized use of dictionary to define terms discussed during deliberations, that "we assume prejudice and thus, we must consider whether the government rebutted that presumption"); *Marino* v. *Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) (holding that unauthorized use of dictionary definitions is reversible error and that government must establish that error is harmless beyond reasonable doubt); *State* v. *Klafta*, supra, 73 Haw. 122 ("[A] juror's obtaining of extraneous definitions or statements of law differing from that intended by the court is misconduct [that] may result in prejudice to the defendant's constitutional right to a fair trial. . . . A new trial will not be granted if it can be shown that the jury could not have been influenced by the alleged misconduct." (Citation omitted; internal quotation marks omitted.)); *Allers* v. *Riley*, supra, 273 Mont. 2, 9 (applying rebuttable presumption of prejudice when jury used extraneous materials—two dictionaries—to redefine critical element of case that was already correctly defined in court's instructions); see also *United States* v. *Console*, 13 F.3d 641, 665–66 (3d Cir. 1993) (applying presumption of prejudice in case in which juror discussed definition of Racketeer Influenced and Corrupt Organizations Act with attorney sister and shared definition with other jurors during deliberations), cert. denied sub nom. *Curcio* v. *United States*, 511 U.S. 1076, 114 S. Ct. 1660, 128 L. Ed. 2d 377 (1994), and cert. denied sub nom. *Markoff* v. *United States*, 513 U.S. 812, 115 S. Ct. 54, 130 L. Ed. 2d 21 (1994)

B

Mindful of these principles, we turn to the particular claims raised by the defendant. We agree with the defendant that he established his entitlement to the presumption of prejudice. The dictionary definition that J.B. consulted was of an essential legal term, and it differed materially from the trial court's definition of the elements of manslaughter. The dictionary purportedly defined manslaughter as the taking of a life "without forethought or malice," whereas the elements provided by the court required proof of recklessness and extreme indifference to human life. As we previously indicated, although we cannot say with certainty whether the trial court imposed the burden on the state to prove that consultation of the dictionary was harmless, the state's burden necessarily would be met if the trial court correctly determined that the evidence established that this conduct caused no actual prejudice to the defendant.

To resolve this issue, we begin with the defendant's

contention that the trial court applied an incorrect legal standard. Specifically, he contends that the court's application of the standard from *State* v. *Johnson*, supra, 288 Conn. 262–64, was incorrect because jurors' consultation of a dictionary does not implicate concerns about the jurors' impartiality but, rather, the possible misuse of the definition in reaching a verdict. We are not persuaded that the trial court applied an incorrect legal standard simply because it framed its inquiry in terms of the misconduct's effect on the jurors' impartiality. As we previously indicated, the right to have a jury decide the case solely on the basis of the evidence presented and the court's instructions on the law is subsumed under the right to a fair and impartial jury. See *State* v. *Rodriguez*, supra, 210 Conn. 325; see also *Hughes* v. *Borg*, supra, 898 F.2d 700. Although we agree that, in light of the term's common meaning and in the absence of any context suggesting a different meaning, a juror likely would interpret a question asking about their ability to be impartial as one inquiring about any bias they might have against the defendant,[22] we are satisfied that the trial court ascribed the proper, broader meaning to the term. The trial court's questions were not limited to those concerning impartiality but specifically concerned whether a dictionary definition of manslaughter had been consulted or raised, whether any outside information had affected the jurors' ability to follow the court's instructions, and whether the jurors considered only the evidence presented and the court's instructions. It is apparent, therefore, that the trial court used the term impartiality to encompass those critical questions.

We agree with the defendant that, when jurors have improperly consulted a dictionary to obtain a definition of a legal term, the ultimate inquiry is whether there is "a [reasonable] possibility that the extrinsic material could have affected the verdict." (Internal quotation marks omitted.) *United States* v. *Steele*, supra, 785 F.2d 746; see *United States* v. *Weiss*, 752 F.2d 777, 783 (2d Cir.), cert. denied, 474 U.S. 944, 106 S. Ct. 308, 88 L. Ed. 2d 285 (1985); *State* v. *Abell*, supra, 383 N.W.2d 812; *Ryser* v. *State*, supra, 453 S.W.3d 41; see also *State* v. *Rhodes*, 248 Conn. 39, 49 n.16, 726 A.2d 513 (1999) ("the critical consideration . . . is not whether prejudice may be assumed from [exposure to such information], but, rather, whether, under the specific facts of the case, any such impropriety actually affected the verdict"). The trial court effectively concluded in the present case that no such possibility existed when it found that J.B. credibly testified that he had relied on only the trial court's instruction defining manslaughter and that the dictionary definition of manslaughter did not influence his decision in the case.

The defendant challenges the propriety of this conclusion but does so on the basis of the record, not as a matter of law.[23] Specifically, the defendant argues that

the trial court could not properly credit J.B.'s ultimate answers because there was other evidence indicating that J.B. in fact did rely on the dictionary definition of manslaughter in the jury deliberations: J.B. recalled the dictionary definition more than one month after trial; he initially gave equivocal responses to the court's questions about relying on the dictionary and only gave the " 'right' " answers after the court steered him in that direction; and his conduct had been sufficiently egregious that, weeks later, another juror reported to court staff that a juror had consulted an outside dictionary during deliberations. The defendant further argues that, because the court could not properly credit J.B.'s responses indicating that he did not rely on the dictionary definition of manslaughter, the court also could not assume that J.B.'s arguments to other jurors were unaffected by this taint. Because the trial court is not permitted to ask the other jurors questions that would gauge the influence of J.B.'s arguments on them, the defendant asserts that the court was required to consider how a typical, hypothetical juror would be affected by the difference between the definitions. See footnote 17 of this opinion (setting forth tests identified by defendant).

We conclude that, although perhaps the trial court reasonably could have drawn the inferences advanced by the defendant, it was not compelled to do so. "[T]he trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 210 Conn. 331. This court must defer to the credibility assessment of the trial court, which has had the opportunity to observe first hand each juror's demeanor and attitude and, therefore, is in the best position to judge his or her credibility and draw inferences therefrom. See *State* v. *Dixon*, supra, 318 Conn. 506. The testimony of the jurors that each was, or would be, fair and impartial, although not determinative, is significant, and "[we] are not inclined to disregard the statements of those jurors . . . as inevitably suspect." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 330; see also *United States* v. *Gillespie*, 61 F.3d 457, 460 (6th Cir. 1995) ("[T]he court should determine whether the jury actually used the dictionary definition to reach [its] verdict. . . . [A] juror's declaration at the hearing exploring these questions is not inherently suspect."). No doubt "[t]he nature and quality of the juror's assurances is of paramount importance; the juror must be unequivocal about his or her ability to be fair and impartial." (Internal quotation marks omitted.) *State* v. *Berrios*, supra, 320 Conn. 296. Although this court may review the transcript to ascertain whether it reveals textual evidence of equivocation, "[e]valuation of any equivocation evinced in tone or manner remains in the province of the trial judge." Id., 296–97.

Some of J.B.'s responses could be viewed as equivocal or nonresponsive. Part of the problem in characterizing those responses is J.B.'s repeated efforts to interject his thoughts about the case and tentative votes by the jury—both of which were forbidden matters that the trial court was assiduously attempting to avoid. The trial court, therefore, reasonably attempted to secure unequivocal answers to its questions.

In *State* v. *Berrios*, supra, 320 Conn. 265, in which we applied a presumption of prejudice to a third party's improper contact with a juror midtrial; id., 294; we concluded that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial because the state had proved that this contact was harmless beyond a reasonable doubt through the jurors' testimonial assurances that the impermissible contact did not affect their impartiality or their ability to decide the case based solely on the evidence admitted at trial. Id., 296. We observed that the trial court's discretion to credit these assurances was reasonable because the jurors' testimony was unequivocal and supported by other facts in the record.[24] See id., 296–99.

Stricter scrutiny may be warranted when jurors are asked *postverdict* whether they acted impartially and in accordance with the court's instructions, especially when the question is posed to a juror who has committed misconduct. See *State* v. *Dixon*, supra, 318 Conn. 507 ("[t]he trial court's assessment of the juror's assurances, [although] entitled to deference, must be realistic and informed by inquiries adequate in the context of the case to ascertain the nature and import of any potential juror bias" (internal quotation marks omitted)); see also, e.g., *State* v. *Holt*, 79 S.D. 50, 53, 107 N.W.2d 732 (1961) (trial court properly relied on jurors' affidavits stating that their use of dictionary for terms relevant to lesser included offenses did not influence their verdict to overcome presumption of prejudice given that verdict on principal charge eliminated consideration of lesser included offenses). In the present case, the trial court's conclusion is bolstered by the fact that the misconduct occurred *before* the court specifically directed the jury not to consult the dictionary and to rely exclusively on the elements in the court's manslaughter instruction. The court's initial charge to the jury did not include such a pointed instruction, and it is reasonably possible that J.B. did not recall the court's specific prohibition on consulting dictionaries from jury selection approximately one month earlier. See footnote 11 of this opinion. The fact that other jurors sent the note to the court to shut down any further efforts by J.B. to discuss the dictionary definition suggests that they would have alerted the court, before the verdict was rendered, if J.B.'s comments suggested that he continued to rely on the dictionary definition after the court responded to the note. The jury deliberated until the day

after the court responded to the note, without further incident. Cf. *Jordan* v. *Brantley*, 589 So. 2d 680, 682 (Ala. 1991) ("[t]he evidence reflects that the jury had not been able to reach a verdict until the dictionary was used"). Under these circumstances, it is reasonable to presume that the jurors followed the court's instructions. See, e.g., *State* v. *Rodriguez*, supra, 210 Conn. 333 ("[t]he jury, in the absence of a fair indication to the contrary, is presumed to have followed the instructions of the court" (internal quotation marks omitted)).

The trial court correctly concluded that the juror misconduct caused no actual prejudice to the defendant. The record clearly establishes that there was no reasonable possibility that any member of the jury relied on the dictionary definition to the defendant's detriment in reaching the verdict. The state proved that the misconduct was harmless beyond a reasonable doubt. The trial court therefore properly denied the defendant's motion for a new trial.[25]

The judgment is affirmed.

In this opinion the other justices concurred.

* November 23, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] The defendant does not challenge his conviction of criminal possession of a firearm. We therefore limit the facts to those relevant to the manslaughter conviction.

[3] An autopsy performed by a state medical examiner revealed that the victim sustained three gunshot wounds: to his left shoulder, to his left leg, and to his torso, in the abdominal area. The bullets that caused the shoulder and leg wounds entered the victim's body from the back. The sequence of the gunshots could not be determined.

[4] "[A] person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating . . . ." General Statutes § 53a-19 (b) (1).

[5] In order to prevail on an unpreserved claim, a defendant must show that (1) the record is adequate to review the alleged claim of error, (2) the claim is of constitutional magnitude alleging the violation of a fundamental right, (3) the alleged constitutional violation exists and deprived the defendant of a fair trial, and (4) if the claim is subject to harmless error analysis, the state has failed to demonstrate harmlessness beyond a reasonable doubt. See, e.g., *In re Yasiel R.*, supra, 317 Conn. 779, 781. A claim is reviewable if the first two prongs are met; the second two prongs involve a determination of whether the defendant may prevail. See id., 779 n.6.

[6] Although our case law typically states this subjective-objective framework in connection with challenges to the second requirement regarding the degree of force necessary to respond; see, e.g., *State* v. *O'Bryan*, supra, 318 Conn. 632; *State* v. *Saunders*, 267 Conn. 363, 373, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004); *State* v. *Clark*, supra, 264 Conn. 732; the fact that both requirements are premised on a reasonable belief makes this framework equally applicable to the first requirement, which is the focus of the parties' arguments in the present case. See *Burke* v. *Mesniaeff*, 334 Conn. 100, 128, 220 A.3d 777 (2019).

[7] Although the self-defense statute also permits this defense when the defendant reasonably believes that he is at risk of great bodily harm; see General Statutes § 53a-19 (a) (2); the defendant's theory in the present case is that he believed that the victim was drawing a gun.

[8] Although the availability of the defense of self-defense does not depend on whether the victim was *in fact* using or about to use deadly physical force because it is the defendant's belief that is material; see, e.g., *State* v. *Clark*, supra, 264 Conn. 732; the presence of a weapon would lend support to the defendant's belief.

[9] Knight was not a particularly helpful witness to either side. The police interviewed her on two occasions. Both interviews were video-recorded. In the first interview, which took place a few hours after the incident in question, Knight stated that she knew nothing about what had happened and that she was alone in the Armada until she tried to leave the pub's parking lot. The second interview took place a few days later, after she was charged with interfering with the police investigation. Knight acknowledged that she had been less than truthful during the first interview. When Knight testified at trial, her recollection of the events at issue was poor, and the state introduced portions of both of her video-recorded statements to the police as prior inconsistent statements under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[10] The court also instructed the jury that the state was required to prove that the defendant used a firearm to cause the victim's death. See General Statutes § 53a-55a.

[11] At the commencement of jury selection, the court provided the following admonishment to prospective jurors: "Please do not do any legal research into any of the issues involved in this case. Please don't look up anything on the Internet, any terms in the dictionary, review any medical textbooks or look up the statutes which might be at issue here. . . . I will instruct you as to the definitions of any terms you need to know, and the lawyers will elicit from the witnesses any explanations of terms or principles which the lawyers believe will be necessary in your deliberations." In its instructions at the commencement of trial two weeks later, the court also admonished the jury that "[i]t is your duty to accept the law and to follow it as I give it to you, whether or not you agree with it."

[12] Although the jury's note reasonably may have been interpreted to imply that no juror had yet consulted a dictionary, the present case demonstrates that the better practice under these circumstances would be for the trial court to conduct an inquiry to confirm that no such action had been taken. Had the court done so in the present case, it could have considered whether to excuse the juror who had in fact already consulted the dictionary and to replace him with an alternate juror. See, e.g., *State* v. *Klafta*, 73 Haw. 109, 123, 831 P.2d 512 (1992).

[13] The jurors are referred to by their initials to protect their privacy interests. See, e.g., *State* v. *Osimanti*, 299 Conn. 1, 30 n.28, 6 A.3d 790 (2010).

[14] When a trial court is presented with allegations of juror misconduct in a criminal case, it must conduct, on the record, an inquiry into the allegations. See *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995). The nature of such an inquiry lies within the trial court's discretion and may vary from a preliminary inquiry of counsel to a full evidentiary hearing. See id., 529. If the court determines that an evidentiary hearing is warranted, it has wide discretion in deciding how to conduct the hearing to determine the nature and effect of information that comes to a juror improperly and its potential effect on the entire jury if it learns of it. See id. There is no claim in the present case that the procedure was in any way deficient or improper.

[15] We have omitted J.B.'s comments that reveal aspects of his, or any other juror's, deliberative process. The trial court's questions clearly were not aimed at eliciting such information, and the trial court properly disregarded any such statements in its decision on the defendant's motion. See *Aillon* v. *State*, 168 Conn. 541, 551–52, 363 A.2d 49 (1975); see also Practice Book § 42-33.

[16] It is unclear what the trial court meant by this comment. Nonetheless, as we explain in this opinion; see footnote 25 of this opinion; the differences in the definitions could not have prejudiced the defendant under the circumstances of the present case.

[17] The defendant identifies three tests applicable to the present circumstances, which he characterizes as follows: (1) a "[d]efinitional" test, which compares the statutory requirement or legal definition provided by the trial court to the dictionary definition and assesses whether application of the dictionary definition could have been harmful to the defendant; see, e.g., *Commonwealth* v. *Wood*, 230 S.W.3d 331, 333–34 (Ky. App. 2007); *State* v. *Abell*, 383 N.W.2d 810, 812–13 (N.D. 1986); (2) a "typical juror" test, which, in recognition of the fact that the trial court is precluded from eliciting evidence regarding the actual effect of the extrinsic information on the jurors, applies an objective, multifactor test to determine whether there is a reasonable possibility that the extrinsic information influenced the verdict to the defendant's detriment; see, e.g., *People* v. *Harlan*, 109 P.3d 616, 625–26 (Colo.), cert. denied, 546 U.S. 928, 126 S. Ct. 399, 163 L. Ed. 2d 277 (2005); and (3) the "*Mayhue*" test; see *Mayhue* v. *St. Francis Hospital of Wichita*,

*Inc.*, 969 F.2d 919 (10th Cir. 1992), which sets forth a multifactor, nonexclusive test to assess prejudice from jurors' use of dictionary definitions. Id., 924; see also *United States* v. *Lawson*, 677 F.3d 629, 646–51 (4th Cir.) (applying *Mayhue* factors), cert. denied sub nom. *Hutto* v. *United States*, 568 U.S. 889, 133 S. Ct. 393, 184 L. Ed. 2d 162 (2012).

Although this court previously has indicated that the effect of juror misconduct or external influences would be assessed under an objective test; see *Sawicki* v. *New Britain General Hospital*, 302 Conn. 514, 523–24, 29 A.3d 453 (2011); *State* v. *Johnson*, supra, 288 Conn. 263 n.26; see also *State* v. *Berrios*, 320 Conn. 265, 287 and n.20, 129 A.3d 696 (2016) (citing with approval objective standard of Second Circuit Court of Appeals); we have not yet had occasion to adopt any particular test.

[18] Because we conclude that the trial court properly relied on the jurors' testimony, we need not consider whether the defendant is entitled to review of his claim regarding the various objective tests he proposes. Insofar as the state suggests that the defendant is not entitled to review of his claim that the trial court improperly placed the burden of proof on him, we see no preservation problem in light of the state's concession before the trial court that it had the burden of proof.

[19] Although we apply a presumption that the trial court properly allocated the burden of proof when the court's decision is silent on that matter; see *Bisson* v. *Wal-Mart Stores, Inc.*, 184 Conn. App. 619, 630 n.11, 195 A.3d 707 (2018); the decision in the present case has statements that appear to conflict on this matter without resolving that conflict. We acknowledge that these ambiguities in the trial court's decision are a reflection of a lack of clarity in our own case law. The trial court quoted this court's case law stating that, "[i]f . . . the trial court is not at fault for the alleged juror misconduct . . . [the] defendant . . . bears the burden of proving that actual prejudice resulted from the misconduct"; (internal quotation marks omitted) *State* v. *Roman*, 320 Conn. 400, 409, 133 A.3d 441 (2016); as well as case law stating that "[c]onsideration of extrinsic evidence is presumptively prejudicial . . . ." *State* v. *Asherman*, supra, 193 Conn. 736.

[20] We underscore that the court's decision potentially could satisfy either standard because it rested on evidence that the court credited, not the defendant's failure to present evidence.

[21] This is not to say that courts have uniformly approached this issue. Some courts distinguish extrinsic information that may be relied on to decide the facts of the case from information that implicates the law in the case. Compare *United States* v. *Cheyenne*, 855 F.2d 566, 568 (8th Cir. 1988) (factual and legal information do not raise same concerns), with *United States* v. *Lawson*, 677 F.3d 629, 645–46 (4th Cir.) (many of same concerns arise when juror uses dictionary as when juror consults with third party), cert. denied sub nom. *Hutto* v. *United States*, 568 U.S. 889, 133 S. Ct. 393, 184 L. Ed. 2d 162 (2012). Some courts distinguish between information obtained from a "standard" dictionary, deeming it reflective of common meaning that jurors may be presumed to know and thus not extrinsic information, and information obtained from a legal dictionary. See, e.g., *Rutland* v. State, 60 So. 3d 137, 144 (Miss. 2011); see also *Ryser* v. *State*, supra, 453 S.W.3d 41.

[22] See, e.g., American Heritage College Dictionary (4th Ed. 2007) p. 694 (defining "impartial" to mean "[n]ot partial or biased; unprejudiced").

[23] It is significant that the defendant does not contend either that the trial court should not have inquired about whether the jurors used the dictionary definition (i.e., outside information) in their deliberations or that negative responses to such inquiries are per se an improper consideration. See *State* v. *Suschank*, 595 S.W.2d 295, 298 (Mo. App. 1979) (because defendant did not object to questioning of jury after verdict, trial court could properly consider testimony of jurors in determining prejudicial effect of use of dictionary). Some jurisdictions do not permit the trial court to inquire whether the jurors actually relied on the definition in deciding the case, viewing such questions as intruding on the deliberative process. See, e.g., *State* v. *Duncan*, 3 Kan. App. 2d 271, 275, 593 P.2d 427 (1979) ("[i]t is not permissible to inquire whether . . . the dictionary definition of 'assault' was given weight by the jury"); *Commonwealth* v. *Wood*, 230 S.W.3d 331, 333 (Ky. App. 2007) (court should consider juror testimony concerning any overt acts of misconduct but not "secret thoughts of jurors"). In such cases, the court would proceed to an objective inquiry as to whether consideration of the definition would affect the verdict of a typical juror.

[24] The testimony adduced at the hearing in *Berrios* established that the defendant's mother had approached one of the jurors during a recess from presentation of evidence, that she had made a negative comment about the

truthfulness of one of the state's witnesses, and that all of the jurors became aware of that contact. See *State* v. *Berrios*, supra, 320 Conn. 269–70. The trial court rejected the defendant's suggestion that the impropriety was extraordinarily prejudicial because it could lead jurors to suspect that the defendant had instigated the jury tampering and had done so in an effort to cause a mistrial, which would cause the jurors to regard him unfavorably in their deliberations. Id., 277, 299. In concluding that the trial court properly could credit the jurors' assurances that they could be impartial despite the improper contact, we pointed to the fact that J, the juror who was approached by the defendant's mother, had reported the incident to the court, whereas, "[h]ad the actions of the defendant's mother left [J] inclined to be less than fair and impartial toward the defendant, [J] likely would have kept that information to himself in an attempt to ensure that he remained on the jury to vote to convict the defendant." (Internal quotation marks omitted.) Id., 297–98. We also noted that, because jurors J and L had expressed understanding for the actions of the defendant's mother, given her obvious concern for the defendant's future, such expressions supported the trial court's determination that the jurors were not biased against the defendant as a result of his mother's actions. Id., 298.

[25] We note that the defendant would not be entitled to a new trial even if the trial court should have discounted the jurors' assurances. See *United States* v. *Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000) ("prejudice presumed, even if not cured by subsequent instructions and juror assurances of impartiality, may be proven harmless if the government can establish there was overwhelming evidence of the defendant's guilt"), cert. denied, 534 U.S. 992, 122 S. Ct. 457, 151 L. Ed. 2d 376 (2001). The defendant's complaint is that the dictionary definition of manslaughter omitted two elements of the statutory definition—that he must have acted recklessly and under circumstances evincing an extreme indifference to human life. See General Statutes § 53a-55 (a) (3). These elements, however, were effectively uncontested. It was undisputed that the defendant fired his gun multiple times at the victim in a dark parking lot where others were present. Defense counsel conceded during his closing argument that the jury could find the defendant guilty of either murder or manslaughter but that such a finding was immaterial because the state could not prove that he had not acted in self-defense. See *State* v. *Singleton*, 292 Conn. 734, 749, 974 A.2d 679 (2009) ("self-defense is a justification for engaging in otherwise criminal conduct" (emphasis omitted; internal quotation marks omitted)). The defendant cannot, therefore, establish prejudice. See, e.g., *United States* v. *Cheyenne*, 855 F.2d 566, 568 (8th Cir. 1988) (no prejudice when dictionary definition was not relevant to only disputed issue); *State* v. *Duncan*, 3 Kan. App. 2d 271, 275, 593 P.2d 427 (1979) ("[w]e agree that the difference in definitions is substantial, but the evidence of [the] defendant's guilt of aggravated assault . . . was overwhelming if not irrefutable"); cf. *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005) ("a jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error" (emphasis omitted; internal quotation marks omitted)).